May it please the Court, Todd Toosey on behalf of Appellants Western Watersheds Project. In this matter I'd like to retain two minutes for reply and I will try to keep track of time. Thank you, sir. This case challenges a 90-day finding by the Fish and Wildlife Service concluding that interior mountain quail is not discrete from western or coastal populations of quail and therefore does not qualify as a distinct population segment under the Endangered Species Act. The Service relied on two principal reasons for this. One, they found that the petition provided, quote, no information on the ecological distinctiveness of interior mountain quail habitat from western or coastal populations. And two, the Service found that interior mountain quail were not, quote, physically isolated and therefore did not qualify as discrete. Now before we get into the substance of this dispute here, there's actually a lot that the parties agree on that this Court should be familiar with. Well, just before we go any further, what is our standard of review here? The standard of review is was the decision arbitrary and capricious. Right. And, sir, if you will, just jumping right into it, this case is not about competing scientific information and whether the Service's interpretation was valid or not. And Western Watersheds is not asking this panel to thread the needle and decide whose science is best. For that reason, Judge O'Scanlan, this case is not like your recent case in Trout Unlimited v. Lone, where the plaintiffs there were challenging the scientific interpretation. And similarly, Judge Fischer and Judge O'Scanlan, you sat on a panel in 1997 called Northwest Ecosystem Alliance. You may recall it was a western grounds squirrel case. There again- Dimly recall. Pardon? Dimly recall 1997. That's 12 years ago. I'm sorry, it was 2000- I thought that was chipmunks, wasn't it? It was 2007, sir. I apologize for that miscitation. Where there again, it was a 12-month finding, very different standard than a 90-day finding. The 12-month standard is, does the list the – is the listing warranted? That's a 12-month determination. And in both Northwest Ecosystem Alliance and the Lone case, this Court found they were not going to second-guess the determinations of the administrative agency. In this case, it's a 90-day finding. Much lower standard of proof. The standard is, does the petition provide substantial- But the standard of proof may be lower, but the standard of review is no different. Absolutely correct, sir. All right. But the standard of proof here, and this is important, is that does the petition provide substantial information indicating that listing may be warranted? The service does not make a determination that it is warranted. And furthermore, the substantial information standard at 50 CFR 424.14 means the amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted. Now, there's a couple of recent court opinions- Sounds like a probable cause standard. It's a reasonable person standard, sir. And when you – and recent courts- Probable cause. As a civil litigator, and that doesn't dive too often into criminal litigation, I will leave that to Your Honor's learned opinion. The district courts have recently interpreted what does reasonable person standard mean, and in fact- You've got to ask the government now for a reasonable, you know, beyond a reasonable doubt standard that they have to meet. I suspect Ms. Thurston may be able to respond to that better than I have. Two recent courts discussed what does this reasonable person standard mean in the context of a 90-day finding. And in Center for Biological Diversity v. Kempthorne, 2008, Westlaw 659822, the Court found that a difference of opinion among and between agency scientists shows that a reasonable person standard is met. And another case out of the Northern District of California, 2007, Westlaw 163244, reasonable – the Court there defined reasonable person to be met when agency scientists disagree on the conclusion of whether it – whether listing may be warranted. So this case is not like the Loan and the Grace World case because we're not at a 12-month finding. Instead, this case turns on this panel's decision whether the service failed to adhere to the distinct population segment. Judge O'Scanlan, you may recall that in the – in the Northwest Ecosystem Alliance case, they challenged the DPS policy. Western Watersheds is not challenging the DPS policy. And in Northwest Ecosystem Alliance and Trout Unlimited, it was a 12-month finding. Here, it is a 90-day finding, and the issue is going to turn on whether the service adequately documented its analysis in the 90-day finding. Now, Judge Fernandez, you recently sat on a panel in Center for Biological Diversity v. U.S. Fish and Wildlife Service, case 2008, Westlaw 1776455, where this Court reversed a decision on a coastal cutthroat trout because the decision and the analysis was not in the listing rule. In fact, that procuring opinion said, we can only consider what the agency did, not what it could have done. The appropriate analysis has to be in the agency decision, and its absence makes the decision arbitrary and capricious. My opposing counsel is going to come up here and talk about all the reasons why the petition was properly denied. But when you go back and look at the Federal Register notice, which is attached in my opening brief, none of that analysis is in the record. So this Court has to review what the agency did and not what it could have done. Now, turning to the ecological discreteness, the listing decision found, quote, that there was no information regarding ecological differences. The petition, starting on page 44 through 40, ER 42 through 44, walks through the ecological differences. And the fact is that the western portions of the interior of the mountain quail populations occupy a very different habitat. They occupy coniferous hardwood, chaparral, all over California. There's a roughly 17 hectares, 17 million hectares of mountain quail habitat in California. That's located at ER 244. In the interior mountain quail, it's only found in narrow corridors of riparian shrub habitat that may or may not have an overstory very close to riparian areas. In Idaho, at ER 246, I believe, that habitat is limited to 12,000 hectares, three orders of magnitude less than the habitat provided for western populations in California. Furthermore, one of the leading scientific publications, the Habitat Conservation Assessment, said that the eastern and western habitats differ greatly, quote, unquote. Another leading figure, Dr. Brennan. I understand ecological differences. You know, you have chaparral, you know, you have hydrate, you have all the different kinds of ecological considerations. And in one sense, scientists consider those habitat considerations. I have one kind of general question. Say you have a beastie who makes a mouse or something, whatever it is, that likes to be in places where there's brush cover. A beastie doesn't do that in a coot. What kind of brush cover it is is long enough covering to protect it from predators in those places. And if this animal is in California, and it's primed, and it's in Idaho, and it's all kinds of different places, there'll be a difference of brush, brush, brush. There's nothing scientific about it. You have frames of a distinct population of species. Is that what you mean by habitat differences? That, you know, one kind of bush grows in Idaho, and a different bush grows in California. That's what you mean, but these guys will duck under the closest bush. That's all. That's what they want. They want some bushes behind them. Is that habitat difference that there's a different kind of bushes? Or is it habitat difference for some other reason? Thank you, sir. I'll answer that as follows. And I won't give you my answer. I'll give you the scientist's answer. It is important to realize when this panel is looking at the habitat differences between interior mountain quail and western populations to know that the scientists look at it at three different levels. They look at it at the ecosystem level, which is a core scale analysis that describes large geographic areas and latitudinal areas. And then that includes the Canadian, the transition, and the Sonoran. In the Canadian, for example, there's Douglas fir. And in the transition, there's Ponderosa pine. And then in the Sonoran, it's the sage steppe. That's the first step that the scientists look at. And then they look at the macrohabitat, which is the immediate large-scale environment. Judge Fernandez, I believe you were getting at this. But this includes specific recognizable vegetation communities. For example, in the western population in California, there's 17 million hectares because there's vast expanses of habitat, whereas in the interior west, they're usually found in interior mountain quail within 100 to 200 feet of riparian areas. This is the macrohabitat levels where the service goes wrong. They never consider whether the difference between occupied habitats at the macrohabitat level is important. And then third Judge Fernandez is down at the ground level. It's called microhabitat. And that talks about whether there's tall, dense shrubs in close proximity to water. So it's all three. The service looks at the first one, the latitudinal. In fact, my opposing counsel cites that mountain quail are found across vast latitudinal areas. That is correct from an ecosystem level. It is also correct from a ground level that the microhabitat is similar because what mountain quail need is brush close to water. But what the service never looks at is the macrohabitat level, which a leading sage-grass, a leading interior mountain quail expert, Dr. Leonard Brennan, with Berkeley, located at 281, sorry, excerpts of the record 281. And I'll just read it. Even, quote, even though the basic structure of mountain quail habitat in the eastern arid portions of its range share several common characteristics with habitats in California, and then I'm going to parenthesis, the configurations of these habitats is drastically different from what I have observed. This is because in California, extensive areas are dominated by mixed brush and chaparral habitat. In California, mountain quail are not restricted to narrow bands within 100 to 200 meters of water like they are in the eastern portion of the range. So it's important, Judge Brennan. In deciding whether it's a distinct population setting. I'm sorry, sir? In deciding the question in front of us, which or all of the habitats is the department required to consider as a matter of law? Okay. Well, first recall that we're at the 90-day stage, not the 12-month stage. So we're not finding, okay, sir. As a matter of cause, what is it that they are required to consider? I have a question for you. Assuming there are three different approaches to that word, three different meanings that came along, or variations, sub-variations of the word itself, which one are they required to consider in reaching a cause? Fair enough, sir. I actually think the answer is looked at a different way. But I will respond to you as best I can, Judge Fernandez, sir. The service found that there was no information on differences of habitat. No information. And I just walked through it. Just one, ER-281, that talks about the difference. You can also, sir, look at ER Exertion of the Record 234, where the scientists again talk about this habitat differs greatly. What if I added the word relevant to the beginning? What if they added the word relevant? Again, sir, the question here is did the service adequately justify its decision? I am, I, I, I. If indeed there is nothing that shows, let's see, what you call ecosystem-relevant differences, is that true? Is that enough for them to say there's no relevant difference? Not in, not in the, as a matter of law. Why, even at the initial stage? Sir, I'll try as best I can again. This is a highly factually intensive investigation, as the panel is aware. It depends on what information is in front of the agency at the time. If the agency had no information on the difference of macro, the great difference between macro habitat occupied in California versus Interior West, they wouldn't need to consider it because it wouldn't be presented to them. If there was no information on the ecosystem differences, they wouldn't need to consider it because it wasn't presented to them. The facts here demonstrate that this information, not just ER 281, but ER Exertion of the Record 234, where another different expert identified vast differences in habitat. So what you're saying is that they got information that they should, A, they said there was no information, B, they're wrong, there was information, and C, they didn't explain or there's no evidence to show why these allegations of habitat differentiation don't make any difference. That's the function of the next stage, I gather. Absolutely, sir. Could you address the physical isolation? Yes, and I'll do it in about 16 seconds, sir. Again, here again you have the service finding that it required physical isolation. That is counter to what a distinct population segment requires. It specifically rejected the idea that the species had to be physically isolated. In its brief, the service then justifies this, quote, physical isolation, but those justifications are found nowhere in the listing rule again, and they are incorrect. And now I'm not asking this panel to judge whether they're incorrect. It's simply enough to see that their justification for the physical isolation is irrelevant. And I would just direct the panel to Exerts of the Record 2941, as well as Exerts of the Record 270 through 286. And I thank you, sir. Thank you, counsel. Your time has expired. We'll hear from the other side, hear from the government. Ms. Thurston. Good morning, Your Honors, and may it please the Court. Alice Thurston on behalf of the U.S. Fish and Wildlife Service. Ms. Thurston. If I may, I'd like to just give us the set up, first of all, the format of where we are in this 90-day finding. The service must first find a listable entity before it proceeds to determine whether or not that entity has or is threatened. There's a requirement, the petition put forth a reasonably defined listable entity that the agency can actually analyze as a separate matter. That's why the DPS policy, which this Court has said merits Chevron deference, requires that the proposed distinct population segment be markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. Would you agree that markedly is not the same thing as isolated? That's clear in our brief, that it need not be isolated. We note, however, that it was the petition that said, and this is in my brief as well, that the species was isolated, the proposed DPS. So when the agency is talking about what the petition says and the support for it, it has every reason to refer back to those claims. Well, that may be. But if the service looks at the claim and says, well, they aren't, we can find reasons to question whether they're truly isolated, but they would meet the markedly separated, would the agency not have to take that into account? Should the agency find that it were markedly separated, it would take that into account. So your position here has to be, does it not, that they're not markedly separated? Our position is that they're not markedly separated, sir, based on way more than simply the question of continuity or discontinuity. Okay. So there's all this talk about the ridge, you know, the mountain ridge and all of this. And in reading through your briefs and petitioners' briefs, I'm struck by the fact that there is a separation in the wording. That is, there's no evidence that the populations on the east side of the Cascades are themselves, unless they're picked up and translated, you know, I forget what the word is, moved over to the other side by human intervention, as happened in the past, which apparently complicates the genetic issue. But where's the evidence that these quail on the eastern side somehow wind up on the western side or vice versa, actually? Well, if I may, if I may. Sure. In all of the references in petitioners' pleadings, they talk about quail in various locations, but it's as if they're saying the quail on the east side of the room versus the quail on the west side of the room. It's a geographic reference. Yes, right. I understand that. But it's not the room. There's a mountain range. No, I know. I understand. There's a mountain range. And if you look at their petition, which is an excerpt of Record 4344, they cite nothing in support of their assertion that the ridges of the Cascades may serve as barriers to movement, quote, unquote. By contrast, the AOU monograph that is cited by both parties on the mountain quail states that, quote, there is significant altitudinal migration among populations that summer at high elevation and that they use ridge tops during spring migration. That's an excerpt of Record 193. It also says that the species is found from the higher foothills to the Sierra crest, where suitable habitat occurs on both sides of the crest. In other words, these are mountain quail. That is the scientific name. They live in the mountains, and there's nothing in the petition or as an inherent aspect of these mountains that prevents the birds from crossing over. And what the agency looked for was some evidence that there was a bright line. It is true that the birds use different types of habitats. The birds are found from the south of California to Washington State. So they use a broad range of habitats going north to south, as well as east to west. But the fact that this bird is a habitat generalist doesn't mean that there is a one which there is somehow one kind of habitat on one side of the room and one kind of habitat on the other. Again, it's like saying it's warmer over on this side of the room than on the other. That doesn't mean that the temperature can't flow back and forth as between the two. And I'd like to point out that there is a heightened burden on petitioners to provide this kind of information to show the distinctness and the discreteness of their purported population segment. If you look at the government's brief on page 40, note 12, Congress was very intent on not having the DPS policy used without the sufficient showing of information. The burden is on the petitioners in this point, in this respect, to show that this may be a discrete population segment. 61 Federal Register at 4725 also takes note of Congress's intent that the DPS policy be used sparingly. And the Home Builders case at 340 Fed 38, Fed Third at 842 points out, this is a Ninth Circuit case, this panel, says that the petition must adequately describe and define the DPS policy for the effective administration of the ESA. I'm guessing it's probably obvious that a bird at this moment at the eastern side of Idaho probably is not and never will come in contact with a bird on the western side of Oregon. I assume that's probably true. Unless they can migrate for extraordinary distances, and I don't think there's anything to suggest they do. If, for example, hypothetically, if they had said the distinct population segment that we're looking at is the 10 miles on the far eastern part of Idaho, and let's assume that those birds just don't mix with the birds on the western part of Oregon, could that piece, at least geographically, be considered a distinct population segment? I should think it would be. I would not, sir, I would not say that it would be a piece. As a geographic matter, it actually has to turn on whether the population is markedly separate, not geographically. That could involve isolation. But in this case, there were other factors. There was the history of translocations. There was a lack of genetic distinction. There was a lack of morphological distinction. And there was not a significant difference in terms of ecological matters that would make it distinct. I'm probably trying to ask you, if you've got birds that pretty much cover the landscape from the western part of Oregon all the way out to the eastern part of Idaho, and they're all mixed up and they mix together and such at any given boundary, does that mean that there is not a distinct population segment? Or could there still be a distinct population segment, i.e., the birds at the far east of Idaho could be distinct? Distinct in terms of the geographical question, intermixing. That's all I'm asking. I'm not talking about genetic. I'm just talking about... But I have to point out that the DPS policy doesn't measure distinctness purely as a geographical matter. I understand it's not purely, but isn't that a factor? It is a factor, but so is physical. I'm talking about that factor only. It is a factor. Yes, sir. In terms of that factor only, could they, with their eastern part of Idaho, meet that factor? It could meet that factor. But that would not necessarily prove that it was distinct, sir. I understand that. Okay. I'm sorry. I'm not finding the thrust of your question. I'm not asking you to draw a conclusion. I'm asking you about that specific factor. That's what we were talking about. Yes, sir. It could be. If it were isolated, yes, it could meet that factor. Now, isolated would mean they're isolated vis-à-vis the birds immediately to the west of them or vis-à-vis the birds in Oregon? I think isolation would be with respect to everything outside of their pocket, if I'm understanding you correctly. I think I understand your answer. Yes. I mean, there are... within the various range of this particular quail. But it is petitioner's burden to describe the DPS in such a way that the government can, in fact, assess the threats to that population segment. That was sort of the lead into my next question, too. So the point is, if they had said, we're talking about a distinct population in the eastern part of Idaho, you would assess that. But if they say we're talking about everything east of... Of the ranges. ...of the range, then that's what you assess. Even though there might be some isolated ones out there, you just assess is it all or nothing is basically what you assess. Is that correct? We assess what they propose, and it is not all or nothing necessarily. I mean, there are an infinite number of subsets that we could assess, the agency in theory could assess. That's what I'm asking. So they propose X, and that's what you assess. That's correct. That's what we're required to do by statute and by the DPS policy. And I would also... So just to make sure I understand, when the ruling says that the petitioners did not provide substantial evidence, or excuse me, substantial information to demonstrate that the populations of mountain quail along the western border of the proposed DPS are physically isolated from nearby eastern populations, we're supposed to understand that you didn't require complete isolation? The Federal Register notice makes it clear that there's continuity and the agency... That's not answering my question. They talk about... It says physical isolation, okay? So as the conversation we've had here today indicates, there's a big difference between isolated, as you've just described it, and markedly separate. Isolation means no movement, in my common understanding of the word. Markedly separated means that there can be some movement maybe, but so what? I mean, there are decisions of BLM that have accepted separation, even though there hasn't been complete isolation. And yet all I have to go on reading this is that they took it as physically isolated. That's the wrong test. So I don't know what the rest of the explanation... And you're going to run out of time, so I have the same problem. By looking at what the service, what is said in this, it says there's no information about ecological differences. And to say there's no information when we just heard your colleague on the other side talk about differences, maybe there's some reason to believe that there's an explanation why the information that on its face talks about differences about ecology isn't relevant or material. But I can't get it out of the ruling because it doesn't say that. The Federal Register notice, in fact, does speak to the other factors. It specifically says that the question of separation or isolation is one of the factors that it considered. It then considers genetic distinction and the translocations, and it discusses, if you look at 3001... I'm talking about the two points that we've talked about, physical barrier, physical separation, and ecological. As I understand it, they want to say, we think that there is a physical difference that is geographical, and I understand the whole process of this, looking to your side of the equation, and the question is to see, can you establish that it is relevant? Because you can look to the different populations and decide whether there are differences. And you said, this says, we can't tell from genetics, so we can't look at the birds' genetics. And ecology and morphology. But ecology includes... Where did they address the two specific statements that were provided? Where do they say why those are not persuasive? Why does it say that there's no information about ecology? If you look at the migration... Where do they say it? It's on page 3004. Okay, where? Where do they address the information that was presented? Excuse me, 3005. We examined the physical, physiological, ecological, and behavioral factors and considered the complicated nature of that. Where's the ecological rebuttal? But they examined, on page 3001, the successional stage, shrub vegetation, dry or eastern portions, steep sloper sets along riparian corridors are notable for seasonal blind migrations, very significant... Where are you reading from? Middle of page 3001, middle column, middle of the column. It makes it the statement that they occur in shrub-dominated communities. It discusses their habitats. Excuse me, that vary across habitat? Mm-hmm. Okay, so there's a variable? Mm-hmm. The drier eastern portions of its range, mountain quail, are normally found in steeper slope areas along riparian corridors consisting of mountain and riparian shrub. That's one of the variables? Mm-hmm. And then at page 3004, they're saying there's no information presented? Page 3004, what the information is not presented, there's a lot of information that the bird inhabits a wide range of habitats. It is a vegetation generalist. There's no information that shows that the bird is somehow markedly separate in its habitat choices in one area versus another. It can move. It has the ability to adapt. It is genetically not discrete. It is able to occupy, and it has been translocated. I mean, if you read the Federal Register notice, historically it occupied the coastal areas. They're not even sure that Idaho and the parts to the east are part of the historic range of this species. These may be birds that are left over strictly from translocations because of the amount of translocations and the bird's great adaptability to cover all of the types of habitat that are discussed in the Federal Register notice and in the administrative record. Thank you, Counsel. Your time has expired. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Fernandez, Fisher